Nos. 26-2031, 26-2032

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

STATE OF CALIFORNIA; COMMONWEALTH OF MASSACHUSETTS; STATE OF NEVADA; STATE OF WASHINGTON; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAIʻI; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WISCONSIN; JOSH SHAPIRO, in the official capacity as Governor of Pennsylvania,

*Plaintiffs-Appellees*,

*v.*

UNITED STATES POSTAL SERVICE; DAVID STEINER, in the official capacity as Postmaster General, Chief Executive Officer of the Postal Service, and Member of the Postal Service Board of Governors; DOUG TULINO, in the official capacity as Deputy Postmaster General, Chief Operating Officer and Chief Human Resources Officer of the Postal Service and Member of the Postal Service Board of Governors; AMBER MCREYNOLDS, in the official capacity as Chair of the Postal Service Board of Governors; DEREK KAN, in the official capacity as Vice Chairman of the Postal Service Board of Governors; RONALD STROMAN, in the official capacity as a Member of the Postal Service Board of Governors; DANIEL TANGHERLINI, in the official capacity as a Member of the Postal Service Board of Governors,

*Defendants-Appellants*,

STATE OF MISSOURI; STATE OF INDIANA; STATE OF MONTANA; STATE OF LOUISIANA; STATE OF KANSAS; STATE OF NEBRASKA; STATE OF ALABAMA; STATE OF FLORIDA; STATE OF TEXAS; STATE OF OKLAHOMA; STATE OF SOUTH DAKOTA; STATE OF SOUTH CAROLINA,

*Intervenor-Defendants-Appellants*.

On Appeal from the United States District Court for the District of Massachusetts

# APPELLEES' CONSOLIDATED OPPOSITION TO APPELLANTS' MOTIONS FOR STAY PENDING APPEAL

*(Counsel listed on inside cover)*

ANDREA JOY CAMPBELL
*Attorney General of Massachusetts*
DAVID C. KRAVITZ
*State Solicitor*
GERARD J. CEDRONE
*Deputy State Solicitor*
VANESSA A. ARSLANIAN
*State Trial Counsel*
JARED B. COHEN
JULIA S. CANNEY
PHOEBE M. LOCKHART
*Assistant Attorneys General*
One Ashburton Place
Boston, MA 02108
(617) 963-2282
Gerard.Cedrone@mass.gov

*Counsel for the Commonwealth of Massachusetts*

NICHOLAS W. BROWN
*Attorney General of Washington*
TERA M. HEINTZ
CRISTINA SEPE
KARL D. SMITH
*Deputy Solicitors General*
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200
Tera.Heintz@atg.wa.gov

*Counsel for the State of Washington*

ROB BONTA
*Attorney General of California*
SAMUEL T. HARBOURT
*Solicitor General*
HELEN H. HONG
*Principal Deputy Solicitor General*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*
AARON D. PENNEKAMP
*Supervising Deputy Solicitor General*
IAN FEIN
L. NICOLE ALLAN
*Deputy Solicitors General*
SETH E. GOLDSTEIN
*Supervising Deputy Attorney General*
ANNE P. BELLOWS
KEVIN L. QUADE
LISA C. EHRLICH
MALCOLM A. BRUDIGAM
MICHAEL S. COHEN
ROBERT WILLIAM SETRAKIAN
*Deputy Attorneys General*
California Department of Justice
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004
(415) 510-3466
Ian.Fein@doj.ca.gov

*Counsel for the State of California*

AARON D. FORD
*Attorney General of Nevada*
K. BRUNETTI IRELAND
*Chief of Special Litigation*
1 State of Nevada Way
Las Vegas, NV 89119
(702) 486-9246
kireland@ag.nv.gov

*Counsel for the State of Nevada*

*(Additional counsel listed in signature block)*

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................ 1
Argument.............................................................................................. 3
I. Appellants are unlikely to succeed on the merits...................... 3
A. USPS lacks statutory and constitutional authority for its unprecedented new rule............................................. 3
B. The USPS rule is also procedurally defective ............. 14
II. The equitable considerations weigh heavily against a stay..... 19
Conclusion ........................................................................................ 28

## INTRODUCTION

The Court is undoubtedly familiar with the procedural history and claims in this extraordinary case. *See* Appellees' Opp. to Motions for Stay, *California v. USPS*, Nos. 26-1987, 26-1991 (Sept. 1, 2026). Under the challenged rule, *see* 91 Fed. Reg. 54966 (Aug. 26, 2026), ballots will not be delivered to voters unless a voter-specific Intelligent Mail barcode (IMb) printed on outgoing and return ballot envelopes matches the IMb uploaded to USPS' database. To comply, state and local officials would have to obtain USPS approval of new ballot-envelope designs; purchase new envelopes to replace those already ordered; develop and upgrade technological systems to generate IMbs; upload voter-specific information to USPS' online portal—a portal that is not yet even operational; ensure that ballots each have the proper IMb for the intended recipient; train state and county-level officials on how to undertake each of these tasks; and attempt to educate voters on USPS' massive changes—all in just the few short weeks before the November elections. *See, e.g.*, Dkt. 156 at 32-43.[1] The district court has now preliminarily enjoined this rule for purposes of this year's elections. And in at least two States—North Carolina and Wisconsin—officials have begun mailing ballots to voters under their ordinary laws and processes.

[1] All citations to the docket are to the district court docket in the plaintiff States' case, unless otherwise noted.

There is no basis for a stay pending appeal. USPS' rule is both substantively and procedurally defective. And the preliminary injunction prevents catastrophic harm to the States and their voters. Indeed, allowing the rule to take effect for this year's elections would be "an unmitigated disaster."[2] That was the phrasing recently used by Utah's Lieutenant Governor, who serves as the State's top elections official. There is also a growing recognition in other non-plaintiff States like Florida and Ohio that implementation of the rule this year would lead to chaos and disenfranchisement. *See, e.g.*, *infra* p. 27. Declarations in the record from over two dozen officials—including the Chair of the Wisconsin Elections Commission, who was appointed by the Republican Speaker of the Wisconsin Assembly, *see* Dkt. 100-1—confirm such fears. In some States, unrebutted evidence establishes that compliance with USPS' rule would be impossible ahead of the midterms, meaning that millions of voters would not be able to cast mail ballots and some would not be able to vote at all. In the remaining States, the rule's chaotic, error-prone rollout would threaten to deny many more voters the ability to vote. To prevent USPS' ultra vires new rule from inflicting such extraordinary harms on our democracy, the Court should deny the requested stay.

---

[2] McKellar, *Utah Clerks Don't Expect Lawsuits Over Trump's Mail-In Voting Rule to Impact Elections This Year*, Utah News Dispatch (Aug. 27, 2026), https://tinyurl.com/bdz8p6u3.

# ARGUMENT

## I. Appellants Are Unlikely to Succeed on the Merits

### A. USPS Lacks Statutory and Constitutional Authority for Its Unprecedented New Rule

1. A federal agency "'literally has no power to act' . . . unless and until Congress authorizes it to do so." *FEC v. Cruz*, 596 U.S. 289, 301 (2022). That principle is especially clear in the context of federal elections because the Constitution commits control to Congress and the States, not the Executive. *See* U.S. Const. art. I, § 4, cl. 1. And here, none of the statutes invoked by defendants even mention mail-ballot verification and non-delivery—let alone authorize USPS to regulate those topics. Nor do they confer on USPS authority to virtually eliminate mail voting on the eve of a major election in States where compliance with the rule would be impossible. *Infra* pp. 21-24. The statutory provisions invoked by defendants instead use generic language to grant USPS authority to adopt "rules and regulations . . . as may be necessary in the execution of its functions" and "provide for the collection, handling, transportation, [and] delivery" of mail. 39 U.S.C. § 401(2); *id.* § 404(a)(1).

Such "humdrum" provisions, *Biden v. Nebraska*, 600 U.S. 477, 499 (2023), cannot support USPS' exercise of sweeping power over elections. Defendants' interpretation of those provisions would grant USPS "virtually unlimited power," *id.* at 502, to severely restrict mail voting—not just for this year's upcoming

elections, when compliance is impossible or virtually impossible in many States, but in all future elections. For instance, USPS could require a notarized signature on the ballot envelope; require voters to deliver their ballots to a mail-processing facility in person; or accept mail ballots only during a short period. And under USPS' theory, it could take any of these steps mere days before mail voting begins in any election cycle. Such power would enable USPS to effectively enact a nationwide policy against mail voting that "Congress has chosen not to enact itself." *Biden*, 600 U.S. at 503.

Congress has hardly been silent on the subject of mail voting. It has addressed the issue multiple times—but only by requiring USPS to make mail voting *easier* for States and voters. The National Voter Registration Act (NVRA) requires USPS to afford favorable postage rates to election mail. *See* 39 U.S.C. § 3629. And the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) requires USPS to deliver eligible ballots "expeditiously and free of postage." *Id.* § 3406(a)(1). At the same time, Congress has repeatedly *declined* to enact legislation that would allow USPS to treat ballots as nonmailable if they do not have barcodes like those required under the rule at issue here. *See, e.g.*, H.R. 5658, 118th Cong. (2023), https://perma.cc/9PXA-A4TS. And when Congress has made major changes to voting laws, it has been careful to provide sufficient lead

time to prevent interference with upcoming elections. *See, e.g.*, 107 Stat. 77 (1993) (NVRA enacted in 1993, but effective 1995).

There is no "historical precedent" for "the breadth of authority that [USPS] now claims," "a telling indication that the [challenged rule] extends beyond the agency's legitimate reach." *NFIB v. OSHA*, 595 U.S. 109, 119 (2022) (per curiam) (internal quotation marks omitted); *see, e.g.*, Dkt. 119-1 ¶ 17. USPS' prior exercises of statutory authority have involved mundane topics like making sure "[a] clear space [is] available on all mail for the address [and] postage," *Domestic Mail Manual*, 602.1.1; setting special "[p]eriodicals prices" for "publisher[s] or registered news agent[s]," *id.* at 207.1.1; and allowing customers to "file an indemnity claim for insured mail," *id.* at 609.1.1. Even the examples of election-specific policies discussed by defendants—such as "recommended," non-mandatory ballot-mail design features, "prioritization" of ballot mail, and delivery of "absentee balloting materials" if a mailer does not "affix the necessary postage," U.S. Mot. 5, 12 (internal quotation marks omitted)—lack the sweeping features and extreme consequences of the novel ballot-verification and non-delivery scheme challenged here. The examples discussed by defendants also make it *easier* for ballots to be delivered and returned. That is consistent with Congress'

judgment, *supra* p. 4, and the bipartisan judgment of many States, that mail voting should be encouraged.[3]

Appellants' principal response is that the USPS rule is "modest." *E.g.*, U.S. Mot. 1, 14; Interv. Mot. 9. In their view, the rule "regulates only how States must design and label [ballot] envelopes" and "requires States to provide information to USPS." U.S. Mot. 11. But "[l]abeling" the rule as modest "does not lessen its effect." *Biden*, 600 U.S. at 496. And USPS' description omits the rule's most significant feature: USPS will *refuse to deliver ballots* that do not satisfy its untested verification protocol. Defendants also ignore the overwhelming record evidence that the rule will likely deny mail ballots to millions of voters. *Infra* pp. 21-25. Giving USPS the authority to interfere with an imminent election in that way would represent a "'transformative expansion in [its] regulatory authority.'" *West Virginia v. EPA*, 597 U.S. 697, 724 (2022). "[C]lear congressional authorization" is necessary before allowing USPS to take on that novel role. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014).

Appellants argue that this case does not resemble prior "major questions" cases because it does not involve a question of economic or political significance. *See* U.S. Mot. 14; Interv. Mot. 13. But the rule challenged here arguably has

[3] *See, e.g.*, Nat'l Conf. of State Legislatures, *Table 18: States with Mostly Mail Elections* (Aug. 7, 2026), https://tinyurl.com/w8xchv7n.

greater political significance than the subject of any of the Supreme Court's prior major-questions cases. Roughly one in three of all voters cast ballots by mail in the November 2024 election. *See* U.S. Election Assistance Comm'n, *Election Admin. and Voting Survey*, at ii (June 2025), https://perma.cc/8J5Y-5TVN. And because the rule's verification and non-delivery requirements will make mail voting impossible in some States while depriving many voters of mail ballots in others, *infra* pp. 21-25, the rule will have a profound, calamitous impact on voting rights. If that does not make this case one of "'political significance,'" *Biden*, 600 U.S. at 502, it is hard to see what would. *Cf. Bost v. Ill. State Bd. of Elections,* 607 U.S. 71, 77 (2026) ("[T]he electoral process" is "'of the most fundamental significance under our constitutional structure.'").

Yet another "telltale sign" that USPS has "transgressed its statutory authority" is that it is regulating well "outside its wheelhouse." *Biden*, 600 U.S. at 518 (Barrett, J., concurring). USPS' "day-in, day-out work," *id.* at 519, of ensuring "efficient postal services at fair and reasonable rates and fees," 39 U.S.C. § 403(a), hardly qualifies it to make complex judgments about elections administration. *Compare* 52 U.S.C. § 20921 (establishing Election Assistance Commission). Yet in the final rule's text, USPS repeatedly invokes policy concerns about "protect[ing] the integrity of federal elections." *E.g.*, 91 Fed. Reg. at 54969. And USPS' motion concedes that the purpose of the rule is to "help protect the integrity

of federal elections." U.S. Mot. 5-6. Indeed, that is the *only basis* USPS has ever provided for the rule. Although plaintiffs' challenge does not turn on the semantic question whether the rule is best understood as "regulat[ing] state administration of elections" or "regulat[ing] the mail," U.S. Mot. 7, it is difficult to see how USPS could conceive of the rule as anything other than an elections regulation when election integrity is its sole policy justification.

The Court should thus be especially hesitant to conclude that Congress intended to "delegate[] [the] 'highly consequential power'" that USPS claims. *Learning Res., Inc. v. Trump*, 607 U.S. 229, 243 (2026) (plurality op.). The Framers deliberately entrusted power over elections to Congress and the States, not the Executive. *See United States v. Gradwell*, 243 U.S. 476, 485 (1917). And where a case involves a "core congressional power," *Learning Res.*, 607 U.S. at 243, or threatens to "'significantly alter the balance between federal and state power,'" Congress must "'enact exceedingly clear language,'" *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021) (per curiam).

2. The new rule also lacks statutory authorization for an independent reason. As USPS has acknowledged, only Congress has "authority to create new categories of 'nonmailable matter.'" 91 Fed. Reg. at 54974. Congress has exhaustively delineated the specific categories of materials that USPS can lawfully refuse to deliver. *See, e.g.*, 39 U.S.C. §§ 3001-3018; *id.* § 3001(a). In other words, the

power to define categories of nonmailable material "has been zealously watched and strictly confined" by Congress. *Hannegan v. Esquire, Inc.*, 327 U.S. 146, 156 n.18 (1946). The Supreme Court thus long ago held that USPS "cannot exclude or refuse to deliver" mail unless specifically authorized by "some law of Congress." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 109 (1902).[4] And critically here, Congress has not authorized USPS to treat ballots as nonmailable.

In its rulemaking, USPS' principal response was that the new verification and non-delivery policy does not qualify as a "mailability" restriction because it imposes "conditions on the acceptance of mailable matter" without "prohibit[ing] [anything] from being mailed altogether." 91 Fed. Reg. at 54973-54974. But the same could be said of many restrictions expressly treated as "mailability" rules by Congress. *See, e.g.*, 39 U.S.C. § 3001(n)(1) ("hazardous material is nonmailable" unless "authorized by" conditions imposed by USPS); *id.* § 3001(g) (fragrance ad samples nonmailable unless sealed in certain way); *id.* § 3010 (conditions on mailing of sexually oriented ads). USPS cannot invent a definition of "mailability" that ignores the way Congress has used the term. And it is telling that, when members of Congress recently proposed legislation conditioning the delivery of ballot mail on States' use of trackable barcodes, they did so by proposing to amend

[4] *See generally Esteras v. United States*, 606 U.S. 185, 195 (2024) (when Congress enumerates an "'established series,' . . . any 'omission' from that series necessarily 'bespeaks a negative implication'").

Title 39's central mailability provision and designating noncompliant ballots as "nonmailable." H.R. 5658, 118th Cong. (2023), https://perma.cc/9PXA-A4TS.

The examples of delivery restrictions highlighted by USPS only confirm the need for express congressional authorization of mailability rules. USPS focuses on restrictions governing cremated remains and replica explosives. U.S. Mot. 9-10; *see* Interv. Mot. 15. But Congress provided express authorization for those restrictions. Specifically, it provided that all "mechanical, chemical, or other devices or compositions . . . and all other natural or artificial articles, compositions, or material which may kill or injure another, or injure the mails or other property . . . are nonmailable," 18 U.S.C. § 1716(a), unless mailed "in accordance with the rules and regulations . . . prescribed by [USPS]," *id.* § 1716(j). Congress also provided that USPS can limit the mailing of "any such articles" that "are not outwardly or of their own force dangerous or injurious." *Id.* § 1716(b).

USPS has long taken the position that Section 1716 provides the source of authority for its restrictions on replica explosives and cremated remains.[5] That longstanding position—which defendants apparently now disavow, *see* U.S. Mot.

---

[5] The cremated-remains and replica-explosives restrictions are included in USPS regulations on "Restricted Matter," which is defined to include "[a]rticles or substances" "restricted by 18 U.S.C. § 1716(a)." USPS, Publication 52, ch. 1, § 122, https://perma.cc/R95W-BAXS; *see also id.*, ch. 2, § 211, https://perma.cc/2J4D-GJQ3 (invoking 18 U.S.C. § 1716); *id.*, ch. 4, §§ 434 (Replica or Inert Explosive Devices), https://perma.cc/YMA6-GHQY, 451.22 (Cremated Remains), https://perma.cc/RK6T-ET8B.

13—was plainly correct. Replica explosives are "devices or compositions" that threaten to "injure" USPS workers or "injure the mails or other property," 18 U.S.C. § 1716(a), because "postal operations have been disrupted and facilities have been evacuated when replica or inert explosive devices have been discovered in the mail," 75 Fed. Reg. 30300, 30300 (June 1, 2010). Cremated remains, like other "[p]owders" subject to USPS mailability restrictions, threaten to "cause soiling, damage, discomfort or destruction, upon escape (leakage)." 90 Fed. Reg. 9843, 9843 (Feb. 19, 2025). They therefore plainly qualify as "compositions" or "material" which "may . . . injure the mails or other property." 18 U.S.C. § 1716(a). To say that ballot mail "does not present the same concerns" (U.S. Mot. 10) as replica explosives and cremated remains—materials that threaten panic, evacuations, postal-service disruptions, and property damage—is "a delicately put understatement." *Watson v. RNC*, 146 S. Ct. 2165, 2175 (2026).

Below, defendants also pointed to USPS' authority to refuse to deliver "unstamped election mail" or "a heavy package if the customer failed to pay sufficient postage" as analogues to the rule's requirements. Dkt. 65 at 15. Defendants now abandon that argument, likely because plaintiffs explained in response that USPS enjoys express statutory authority to engage in those activities. Under 39 U.S.C. § 404(a)(2), USPS may "prescribe . . . the amount of postage and

the manner in which it is to be paid." And under 39 U.S.C. § 3001(c)(1), "[m]atter which . . . exceeds [USPS-devised] size and weight limits . . . is nonmailable."[6]

Defendants now pivot to the remarkable claim that USPS' new ballot non-delivery scheme is analogous to the requirement that a delivery address appear "'visible and legible'" on an envelope. U.S. Mot. 13-14. Defendants observe that "there does not appear to be any specific statutory authority for" that requirement. *Id.* Of course, an identifiable address is a necessary precondition to USPS' ability to "provide for the . . . delivery . . . of mail." 39 U.S.C. 404(a)(1). And basic postage formatting requirements have always been treated as different in kind from restrictions concerning the mailability of specific materials. Otherwise, USPS would have unlimited power to devise *any* new mailability restriction it wishes without explicit statutory authority. That has not been the law for over a century, *see McAnnulty*, 187 U.S. at 109, and once again, USPS has *already acknowledged* that it lacks such authority, *see* 91 Fed. Reg. at 54974.

3. USPS does not dispute that plaintiffs may bring the foregoing challenge to its authority, but argues that judicial review of the claim must be "narrowly circumscribed" because the agency is "exempted . . . from Administrative Procedure Act review." U.S. Mot. 7 (citing 39 U.S.C. § 410(a)). Even if that were

[6] Congress has also given USPS ample authority to address solicitations directed toward "retirement communities" for purposes of "elder-abuse mail scams." U.S. Mot. 11; *see, e.g.*, 39 U.S.C. §§ 3001(d), 3005(a)(1).

true as a general matter, *but cf. Air Courier Conf. of Am. v. Am. Postal Workers Union*, 498 U.S. 517, 522-523 (1991) (reserving the question), it is not the case here. Review under the APA is plainly available for "proceedings concerning the mailability of matter." 39 U.S.C. § 3001(m). This rulemaking is a "proceeding." Indeed, USPS repeatedly referred to it that way. *E.g.*, 91 Fed. Reg. at 54967-59468. And for the reasons discussed above, *supra* pp. 8-12, the rulemaking concerned "the mailability of matter." *See* Dkt. 156 at 30-31 (concluding that 5 U.S.C. § 706(2) applies).

Regardless of the APA's applicability here, USPS' authority to issue the challenged rule would still be subject to review. The Supreme Court has repeatedly held that "plaintiffs may sue in equity without a congressionally-provided cause of action to prevent an injurious action by a public officer." *Trump v. Cook*, 146 S. Ct. 2234, 2251 n.2 (2026) (internal quotation marks omitted). The decision in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), provides a classic example: plaintiffs argued that the President's seizure of steel mills was ultra vires because it was "not authorized by an act of Congress or by any constitutional provisions." *Id.* at 583. Plaintiffs' claim here—that USPS lacks any statutory or constitutional basis for its rule—is materially indistinguishable.

According to USPS, plaintiffs can succeed on an "ultra vires" claim only if they show that the rule violates a "specific prohibition" in a statute. U.S. Mot. 8

(quoting *NRC v. Texas*, 605 U.S. 665, 681 (2025)). The Supreme Court, however, has applied that standard only in cases where plaintiffs sued outside an otherwise available judicial review scheme. *See NRC*, 605 U.S. at 680-682 (Hobbs Act); *Leedom v. Kyne*, 358 U.S. 184, 187-188 (1958) (Wagner Act). By contrast, where no alternative statutory review scheme is available, the Court has addressed lack-of-authority claims without applying the *NRC* standard. *See, e.g.*, *Cook*, 146 S. Ct. at 2246-2251 & n.2; *Learning Res.*, 607 U.S. at 248-255; *Trump v. Illinois*, 146 S. Ct. 432, 434 (2025); *see also McAnnulty*, 187 U.S. at 110. Defendants' request to apply the *NRC* standard fails to account for those cases. And if accepted, defendants' position would have extraordinary consequences: USPS would be free to take enormously consequential actions contrary to law, and the judiciary would be powerless to step in unless *NRC*'s high bar were satisfied.

**B. The USPS Rule Is Also Procedurally Defective**

Serious procedural flaws provide additional reasons to enjoin the new rule—at least with respect to this year's rapidly approaching midterm elections. Although the district court declined to address these other arguments, Dkt. 156 at 31 n.36, they offer further reason to deny the stay, *Cook*, 146 S. Ct. at 2251 n.3 (appellate courts "'revie[w] judgments, not statements in opinions'" and so—even when considering a motion to stay a preliminary injunction pending appeal—courts are not limited to "the *reasons* given by [a] lower court[]").

1. "One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016); *see* 5 U.S.C. § 706(2)(A). USPS flouted that requirement here because it said "almost nothing" about its consequential decision to apply the rule to the imminent November elections. *Encino Motorcars*, 579 U.S. at 223. Although the agency briefly noted the "logistical or financial difficulties [that] states may face complying with the rule," 91 Fed. Reg. at 54985, the agency nowhere acknowledged the *consequences* of States' inability to comply with the rule in time for the November elections: namely, the threat that millions of Americans will be deprived of their ability to vote by mail and, in many cases, their ability to vote at all. *Infra* pp. 21-27. "[A]n agency cannot simply ignore" such "'an important aspect of the problem' before it." *Ohio v. EPA*, 603 U.S. 279, 292, 294 (2024). USPS had an obligation to address that problem and take "'accountability'" for the consequences of its decision. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 22 (2020).

Instead, USPS gave only passing mention to States' "claims that immediate implementation would prove impossible." 91 Fed. Reg. at 54985. Nothing in the final rulemaking suggests that the agency made any effort to evaluate the plausibility of those claims. Rather, the rulemaking's reference to "*potential[]* . . . new costs" incurred by elections administrators, *id.* (emphasis added), suggests that

USPS failed to actually evaluate States' concerns on this score. *See Ohio*, 603 U.S. at 295 ("awareness" of a concern "is not itself an explanation").

USPS also failed to address "serious reliance interests" upended by its decision. *Encino Motorcars*, 579 U.S. at 224. For example, because States "have long organized their election systems around existing mail ballot procedures" and relied on USPS to facilitate mail voting and deliver their ballots, those that are unable to comply with the rule this fall will face "substantial financial and administrative burdens" in trying to quickly return to in-person voting. Dkt. 1-1 at 22; *see infra* p. 26. In States that "no longer ha[ve] the infrastructure to accommodate a last-minute reversion to in-person voting," immediate implementation of the rule would be "catastrophic." *E.g.*, Dkt. 4-4 ¶ 42. USPS "offered no reasoned response" to these and other significant reliance-interest concerns raised during the rulemaking. *Ohio*, 603 U.S. at 293.

USPS' only explanation for applying the rule to the November elections was its assertion that "the visibility and law-enforcement benefits of the rule" justified immediate implementation. 91 Fed. Reg. at 54985. But "conclusory statements do not suffice to explain" an agency's decision. *Encino Motorcars*, 579 U.S. at 224. And elsewhere in the rulemaking, USPS expressly declined to make any findings about "the incidence of [mail] voter fraud." 91 Fed. Reg. at 54969. The agency's explanation for immediate implementation therefore does not provide a "'rational

connection'" between "'facts found and the choice made.'" *Ohio*, 603 U.S. at 292. And that is particularly so because the explanation does not account for the fact that the purported "visibility and law-enforcement benefits" will not—and cannot—materialize in States that are unable to comply with the rule for the fall elections. 91 Fed. Reg. at 59485. "Perhaps there is some explanation why the number and identity of participating States" would not change USPS' calculus about the respective benefits and costs of immediate implementation, "[b]ut if there is," "it does not appear in the final rule." *Ohio*, 603 U.S. at 293-294.

2. USPS also failed to seek an advisory opinion from the Postal Regulatory Commission before making a "change in the nature of postal services" that will "generally affect service on a nationwide or substantially nationwide basis." 39 U.S.C. § 3661(b). In its final rule, USPS asserted that it had no obligation to consult with the Commission because the final rule will not have a "meaningful impact" on—or change the nature of—postal services. 91 Fed. Reg. at 54976 (quoting *Buchanan v. USPS*, 508 F.2d 259, 262-263 (5th Cir. 1975)); *see also* Interv. Mot. 17-19. But the final rule will indisputably have a meaningful impact on USPS' delivery of mail ballots nationwide. *Infra* pp. 21-27. That such ballots are a "subset" of the mailstream is irrelevant. 91 Fed. Reg. at 54976. USPS has previously requested advisory opinions even when the proposed change would

affect only a subset of the mail. *See, e.g.*, 87 Fed. Reg. 18044 (Mar. 29, 2022) (requesting opinion on changes to retail ground and parcel select ground mail).

The rule will also change the "nature" of USPS services because the agency has never before embarked on a ballot-verification program or refused to deliver mail ballots to voters. 39 U.S.C. § 3661(b); *supra* p. 5. USPS' conclusory assertion that the rule would not affect the "experience of the individual postal consumer," 91 Fed. Reg. at 54976 (quoting *Pennsylvania v. DeJoy*, 490 F. Supp. 3d 833, 885 (E.D. Pa. 2020)), ignores that compliance will be impossible or virtually impossible for many States this fall. For that reason, and because of USPS' own technological feasibility challenges, *infra* pp. 21-27, millions of voters across the Nation likely will not receive the mail ballots to which they are entitled under state law—thereby unquestionably affecting the "experience" of those "individual postal consumer[s]." Had USPS consulted with the Commission, as Congress intended, the agency would have had to address the technological and feasibility challenges that are likely to result in an impending "disaster." Katz, *Postal Officials Say Trump's Mail-Ballot Push Will Create Widespread Errors*, NOTUS (Aug. 27, 2026), https://perma.cc/SFX9-BZBD (quoting Commissioner who criticized USPS officials for failing to "run the tests" to see whether "the damn thing will work"); Stmt. of Comm'r Day, Dkt. C2026-27 (Postal Regul.

Comm'n Sept. 3, 2026), https://tinyurl.com/yc7bnhzd (reiterating concerns about inadequate "advance testing and validation").[7]

## II. THE EQUITABLE CONSIDERATIONS WEIGH HEAVILY AGAINST A STAY

1. Defendants and intervenors have not established that they will be irreparably harmed without a stay. The district court's injunction does not "preclude[] States from voluntarily complying" with the rule, and prohibits the rule's mandatory requirements only as applied to the November 2026 election. Dkt. 156 at 46. USPS may thus continue its development of the portal; voluntarily work with States that wish to comply with the rule's formatting and data requirements for the November 2026 election; and prepare to implement the rule for elections after the midterms.

Appellants contend that they are nevertheless harmed because USPS "may not implement the rule's verification process." U.S. Mot. 3; *see* Interv. Mot. 22. But that argument presumes the existence of a functioning portal. At present, the portal "is not . . . operational," Dkt. 156 at 38; USPS has represented only that it "anticipate[s]" the portal may become available "sometime" this week, Dkt. 150-1 ¶ 3. Even if USPS were ultimately able to launch the portal before November,

[7] Defendants argued below that plaintiffs were required to exhaust this claim before the PRC before bringing it in court. Dkt. 17 at 12. That is incorrect. *See DeJoy*, 490 F. Supp. 3d at 862, 864. There was certainly no need to do so where it would have been impossible to obtain relief ahead of the November elections. *See New York v. Trump*, 181 F.4th 132, 140 n.3 (D.C. Cir. 2026).

there are serious reasons to doubt that it would properly function for purposes of USPS' "verification process." U.S. Mot. 3; *see infra* p. 25. Defendants have also failed to show—as they have asserted in the Supreme Court, *see* Appl. 30, *USPS v. California*, No. 26A305 (Sept. 6, 2026)—that "the injunction bars USPS from training its employees to conduct the verification process." Because the injunction is inapplicable to future elections, *see* Dkt. 156 at 46, there is nothing blocking USPS from training employees on the verification process prescribed by the rule so long as such training is geared toward future elections.

Appellants' concerns about "issues regarding [mail-ballot] compliance with federal law" (U.S. Mot. 18; Interv. Mot. 22) are also wholly unfounded. USPS expressly declined to resolve "[w]hether or not voter fraud is common or uncommon," 91 Fed. Reg. at 54969, and the district court found that "the record includes no evidence relating to fraudulent mail voting," Dkt. 156 at 45-46. And if intervenors are capable of complying with all of USPS' new restrictions—as they assert, *see* Interv. Mot. 23—they should have no need for USPS to reject noncompliant ballots. There is also nothing preventing intervenors from deploying their own "election integrity measures" for the November elections. *Id.* at 22. Until recently, no similar USPS rule ever existed. Yet States have long employed

protocols to protect against elections fraud.[8] And studies have repeatedly demonstrated that fraud related to mail voting is extraordinarily rare, undercutting any claim of irreparable harm. *See, e.g.*, Dkt. 1-1 at 19 & n.12.

2. Granting a stay, by contrast, would threaten catastrophic harms for States and the public. After comprehensively studying the declarations in the record, the district court found that "compliance by State and local officials with the Final Rule [will be] 'virtually impossible' for the November 3, 2026 midterm elections." Dkt. 156 at 43-44. The district court catalogued compliance obstacles presented at each step of the rule's process: it is "impossible" for many States to obtain compliant envelopes in time for the midterms, *id.* at 35; if envelopes can be secured, obtaining USPS approval will take "weeks or months" with "hundreds or thousands of ballot envelopes and return envelopes" submitted at the same time for review, *id.* at 37; States cannot "submit voter information to a portal that does not yet exist and has not been proven to work," *id.* at 45; verifying compliance before sending out ballots will consume "'an immense amount of time,'" *id.* at 42; and "any minor malfunction" in any of those steps "will result in the denial of mail ballots," *id.* at 45. Moreover, "because the USPS has conditioned sending mail

[8] *See, e.g.*, Nat'l Conf. State Legislatures, *How States Verify Voted Absentee/Mail Ballots* (updated May 20, 2026), https://perma.cc/RVF3-9KAL.

ballots on compliance, disenfranchisement [of voters] is unavoidable, rather than hypothetical for the upcoming elections." *Id.* at 44.

The district court's findings are well-supported. For example, a declaration submitted by the Chair of the Wisconsin Elections Commission attests that "[i]t would be virtually impossible for Wisconsin to comply with the Rule." Dkt. 100-1 ¶ 21. Municipal clerks are required to mail absentee ballots to all requests on file no later than September 17, and the State lacks sufficient time (and funds) to reprint the ballot envelopes that it has already printed for the November elections. *See id.* ¶¶ 15, 29. Wisconsin's envelopes could only become mailable under the new USPS rule if the State's elections officers could "print and hand-affix stickers with the Rule-compliant IMb codes on" each envelope. *Id.* ¶ 29. But that labor-intensive solution invites errors that risk disenfranchising voters. *Id.* ¶¶ 32-34. "[A] clerk could easily place the sticker on the wrong envelope by mistake" or "mix-up which stickers belong to which voter." *Id.* ¶ 32. In any event, completing that work in time for the midterms would be "impossib[le] for many jurisdictions"—particularly "rural municipalities," which may not even "have the required label printing capability" and "often have a single employee performing all elections-related work." *Id.* ¶ 30.

Like many States, Wisconsin relies on thousands of municipal employees, rather than centralized state officials, to make absentee voting changes to voter

databases. Dkt. 100-1 ¶ 5. To enroll voters with USPS' new portal, then, those thousands of employees "would need to be trained in how to use the new technology, become authorized users, and then enter the data" required by the rule—"all within the next two weeks." *Id.* ¶ 26. But that is wildly unrealistic. Many of the employees responsible for completing these tasks "hold the[ir] positions on a part-time basis, have other full-time jobs, and . . . have little to no administrative support." *Id.* Given these challenges, "full and accurate compliance is extremely unlikely" in advance of the midterms. *Id.* The rule thus risks "disenfranchisement for . . . eligible voter[s]"—including "populations that are particularly dependent on absentee voting, such as voters in rural areas, voters with disabilities, and voters that lack reliable means of transportation." *Id.* ¶ 34.

Other States offer similar accounts. Washington has already printed millions of ballot packets, and two of its three printing vendors have said that they cannot reprint ballot envelopes, and it is "very unlikely" that the third vendor could reprint envelopes. Dkt. 4-4 ¶ 42. Oregon has "neither the time nor the money to design, review, and reorder envelopes before ballots begin to be mailed to [the State's approximately 3 million] voters in mid-September." Dkt. 4-19 ¶ 37; *see id.* ¶ 35. In Colorado, nearly 1.3 million existing ballot return envelopes will have to be discarded, and re-printing these envelopes "may not even be possible." Dkt. 4-6

¶ 42. And Hawai‘i reports it "may not be possible to get new . . . envelopes delivered to Hawai‘i from the continent on such short notice." Dkt. 4-10 ¶ 43.

Even assuming that some States could replace their current envelopes with USPS-approved envelopes, other aspects of the rule make it infeasible to comply this election cycle. For example, California's voter registration system "is not currently equipped to receive IMb information for individual voters," and the systems used by each of California's 58 counties likewise are not prepared "to store and transmit" this IMb information. Dkt. 4-1 ¶ 19. Those systems would need to be updated before the State could begin mailing compliant ballots—an impossible proposition, given that similar modifications have historically "take[n] more than a year to develop, test, . . . and deploy." *Id.* Other States face similar obstacles. *See, e.g.*, Dkt. 4-15 ¶ 24; Dkt. 4-21 ¶ 27.

The rule's requirements also present serious risks of errors and resulting disenfranchisement. In Massachusetts, for example, compliance with the rule would require the State's "351 local election offices" to "*manually* capture[] and update[]" the IMb information "for each voter's ballot envelopes." Dkt. 4-2 ¶ 33 (emphasis added). Because Massachusetts anticipates that election officials "will mail approximately 1 million ballots to voters during the 2026 general election," *id.* ¶ 43, this kind of manual data entry will inevitably increase the risk of errors that could "prevent voters from receiving absentee or mail-in ballots," *id.* ¶ 51; *see*

*also* Dkt. 119-1 ¶ 112 (expert explaining that "even a single data error would jeopardize an entire mailing containing thousands, potentially millions, of individual ballots"). Other States have identified similar risks. *See, e.g.*, 4-6 ¶ 28 (Colorado); 4-11 ¶ 22 (Maine); 4-14 ¶ 24 (Minnesota); 4-15 ¶ 24 (New Jersey); 4-20 ¶ 23 (Pennsylvania).

USPS' untested new programs only compound these concerns. For example, USPS' new online portal for enrolling voters and its ballot-scanning technology "does not yet exist." Dkt. 156 at 45. And no one knows if it will actually function as intended if USPS is able to launch the portal before States must send out their ballots. Dkt. 4-1 ¶¶ 28-29. USPS' only declaration about the portal offered no assurance that it will function properly. Dkt. 150-1. Recent revelations from a USPS whistleblower raise significant concerns that it will not, *see* Dkt. 115, as do alarmed comments from a member of the Postal Regulatory Commission, *supra* pp. 18-19. Nor is it clear that USPS can competently administer a ballot-verification program that is unlike anything it has ever undertaken. Its recent performance has not been encouraging. *See, e.g.*, Dkt. 4-2 ¶ 18 (discussing recent USPS election-related failures); 4-4 ¶ 22 (same); 4-5 ¶ 18 (same).

For many voters, the unavailability of mail voting would make it impossible to vote at all. Disabled voters, for example, face so many barriers to voting in person that voting by mail is often "their only option to cast a ballot." Davidson,

*American Association of People with Disabilities Applauds Supreme Court Protecting Mail Ballot Grace Periods* (June 29, 2026), https://perma.cc/2QGV-4JV2. And in some States, a return to the prior era of in-person voting is not an option. For example, Washington is an entirely vote-by-mail state and "the State no longer has the infrastructure to accommodate a last-minute reversion to in-person voting." Dkt. 4-4 ¶ 42. In Hawai'i, there is "simply insufficient time to coordinate the necessary polling places, volunteers, and logistical framework that would be necessary to emulate the prior polling place model that existed prior to the advent of elections by mail." Dkt. 4-10 ¶ 24. And "Oregonians have no other means by which to cast their votes." Dkt. 4-19 ¶ 18.

Before the Supreme Court, defendants conceded that disenfranchisement harms the public interest. Appl. 27, *USPS v. California*, No. 26A297 (Sept. 3, 2026). In fact, they justified their request for a stay on the theory that if the district court's order is later "vacated on appeal," States may not have "time to comply with [the rule's] requirements, which could well end up depriving their voters of the ability to vote by mail." *Id.* at 26. But unrebutted record evidence shows that it is virtually impossible for plaintiff States to comply with the rule's requirements *now*, jeopardizing their voters' ability to vote by mail *now.* *See* Dkt. 156 at 43-44.

And plaintiff States are not alone in this regard: As discussed above, *supra* p. 2, Utah's top elections official has cautioned that the rule's rollout would be an

"unmitigated disaster." In Florida, USPS recently rejected ballot envelopes submitted for inspection, leading an elections official to conclude that "[i]f the rule goes into effect, we will have tens of thousands, if not hundreds of thousands of disenfranchised voters in Florida."[9] "Ohio's county election officials are warning against [the] . . . proposed changes to mail-in ballot procedures, saying the restrictions could delay access, increase costs and add significant stress to already busy workers."[10] And a bipartisan coalition of elections officials, including officials in non-plaintiff States, urged USPS to give States at least one year to comply, explaining that "changes made less than 90 days before an election risk administrative mistakes and voter confusion."[11]

At least two States, moreover, have already begun to mail out ballots under their ordinary state laws and processes. Dkt. 100-1 ¶ 14 (Wisconsin); U.S. Mot. 16 (North Carolina). There is no good reason, at this late stage of the election cycle, to deny other States the same opportunity. To preserve the ability of millions of people to vote—and prevent the chaos and confusion that would result from allowing the USPS rule to take effect—the Court should deny the requested stay.

---

[9] Griffin et al., *Trump's War on Mail-In Ballots Has Voters Baffled*, N.Y. Times (Sept. 6, 2026), https://tinyurl.com/yuaafke6.

[10] Trau, *Ohio Election Officials Warn Against Trump's Mail-In Ballot Changes*, News 5 Cleveland (Aug. 28, 2026), https://tinyurl.com/wy54spfw.

[11] Bipartisan Policy Ctr., *Public Comment on USPS Proposed Rule on Ballot Mail* (July 6, 2026), https://tinyurl.com/5hxns724.

## CONCLUSION

The motions for a stay pending appeal should be denied.

Dated: September 7, 2026

Respectfully Submitted,

ANDREA JOY CAMPBELL
*Attorney General of Massachusetts*

DAVID C. KRAVITZ
*State Solicitor*
GERARD J. CEDRONE
*Deputy State Solicitor*
VANESSA A. ARSLANIAN
*State Trial Counsel*
JARED B. COHEN
JULIA S. CANNEY
PHOEBE M. LOCKHART
*Assistant Attorneys General*
One Ashburton Place
Boston, MA 02108
(617) 963-2282
Gerard.Cedrone@mass.gov

*Counsel for the Commonwealth of Massachusetts*

ROB BONTA
*Attorney General of California*

By: */s/ Ian Fein*
SAMUEL T. HARBOURT
*Solicitor General*
HELEN HONG
*Principal Deputy Solicitor General*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*
AARON D. PENNEKAMP
*Supervising Deputy Solicitor General*
IAN FEIN
L. NICOLE ALLAN
*Deputy Solicitors General*
SETH E. GOLDSTEIN
*Supervising Deputy Attorney General*
ANNE P. BELLOWS
KEVIN L. QUADE
LISA C. EHRLICH
MALCOLM A. BRUDIGAM
MICHAEL S. COHEN
ROBERT WILLIAM SETRAKIAN
*Deputy Attorneys General*
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3466
Ian.Fein@doj.ca.gov

*Counsel for the State of California*

AARON D. FORD
*Attorney General of Nevada*
K. BRUNETTI IRELAND
*Chief of Special Litigation*
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
(702) 486-9246
kireland@ag.nv.gov

*Counsel for the State of Nevada*

NICHOLAS W. BROWN
*Attorney General of Washington*
TERA M. HEINTZ
CRISTINA SEPE
KARL D. SMITH
*Deputy Solicitors General*
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200
Tera.Heintz@atg.wa.gov

*Counsel for the State of Washington*

KRISTIN K. MAYES
*Attorney General of Arizona*
KARA KARLSON
KAREN J. HARTMAN-TELLEZ
SYREETA TYRELL
*Assistant Attorneys General*
2005 North Central Avenue
Phoenix, AZ 85004
(602) 542-8118
Kara.Karlson@azag.gov

*Counsel for the State of Arizona*

PHILIP J. WEISER
*Attorney General of Colorado*
SHANNON STEVENSON
*Solicitor General*
PETER BAUMANN
*Senior Assistant Attorney General*
1300 Broadway
Denver, CO 80203
(720) 508-6400
Shannon.Stevenson@coag.gov

*Counsel for the State of Colorado*

WILLIAM TONG
*Attorney General of Connecticut*
MAURA MURPHY
*Deputy Associate Attorney General*
165 Capitol Avenue, Suite 5000
Hartford, CT 06106
(860) 808-5020
Maura.Murphy@ct.gov

*Counsel for the State of Connecticut*

KATHLEEN JENNINGS
*Attorney General of Delaware*
IAN R. LISTON
*Director of Impact Litigation*
VANESSA L. KASSAB
*Deputy Attorneys General*
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
Ian.Liston@delaware.gov

*Counsel for the State of Delaware*

BRIAN L. SCHWALB
*Attorney General of the District of Columbia*
CAROLINE S. VAN ZILE
*Solicitor General*
KARTHIK P. REDDY
*Special Assistant Attorney General*
400 6th Street, NW
Washington, DC 20001
(202) 724-6609
caroline.vanzile@dc.gov

*Counsel for the District of Columbia*

ANNE E. LOPEZ
*Attorney General of Hawaiʻi*
KALIKOʻONALANI D. FERNANDES
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

KWAME RAOUL
*Attorney General of Illinois*
JANE ELINOR NOTZ
*Solicitor General*
ALEX HEMMER
*Deputy Solicitor General*
115 S. LaSalle Street
Chicago, IL 60603
(312) 814-5526
Alex.Hemmer@ilag.gov

*Counsel for the State of Illinois*

AARON M. FREY
*Attorney General of Maine*
KATHERINE W. THOMPSON
*Special Counsel*
6 State House Station
Augusta, ME 04333
(207) 626-8800
Kate.Thompson@maine.gov

*Counsel for the State of Maine*

ANTHONY G. BROWN
*Attorney General of Maryland*
JULIA DOYLE
*Solicitor General*
VIRGINIA A. WILLIAMSON
*Assistant Attorney General*
200 Saint Paul Place
Baltimore, MD 21202
(410) 576-6584
vwilliamson@oag.state.md.us

*Counsel for the State of Maryland*

DANA NESSEL
*Attorney General of Michigan*
NEIL GIOVANATTI
*Assistant Attorney General*
P.O. Box 30736
Lansing, MI 48909
(517) 335-7659
GiovanattiN@michigan.gov

*Counsel for the State of Michigan*

KEITH ELLISON
*Attorney General of Minnesota*
ANGELA BEHRENS
ALLEN COOK BARR
*Assistant Attorneys General*
LINDSEY E. MIDDLECAMP
*Special Counsel*
445 Minnesota Street, Suite 600
St. Paul, MN 55101
(651) 300-0711
Angela.Behrens@ag.state.mn.us

*Counsel for the State of Minnesota*

JENNIFER DAVENPORT
*Attorney General of New Jersey*
MEGHAN K. MUSSO
JONATHAN MANGEL
JOSHUA P. BOHN
*Deputy Attorneys General*
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5276
Meghan.Musso@law.njoag.gov

*Counsel for the State of New Jersey*

RAÚL TORREZ
*Attorney General of New Mexico*
BAILEY COLFAX
*Assistant Attorney General*
408 Galisteo Street
Santa Fe, NM 87501
(505) 490-4060
bcolfax@nmdoj.gov

*Counsel for the State of New Mexico*

LETITIA JAMES
*Attorney General of New York*
BARBARA D. UNDERWOOD
*Solicitor General*
JUDITH N. VALE
*Deputy Solicitor General*
RABIA MUQADDAM
*Chief Counsel, Federal Initiatives*
28 Liberty Street
New York, NY 10005
(212) 416-6046
Judith.Vale@ag.ny.gov

*Counsel for the State of New York*

JEFF JACKSON
*Attorney General of North Carolina*
LAURA HOWARD
*Chief Deputy Attorney General*
DANIEL P. MOSTELLER
*Associate Deputy Attorney General*
114 W. Edenton Street
Raleigh, NC 27603
(919) 716-6026
dmosteller@ncdoj.gov

*Counsel for the State of North Carolina*

DAN RAYFIELD
*Attorney General of Oregon*
THOMAS H. CASTELLI
*Senior Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Thomas.Castelli@doj.oregon.gov

*Counsel for the State of Oregon*

PETER F. NERONHA
*Attorney General of Rhode Island*
MEGAN ROK
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400
mrok@riag.ri.gov

*Counsel for the State of Rhode Island*

CHARITY R. CLARK
*Attorney General of Vermont*
RYAN P. KANE
*Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-2153
Ryan.Kane@vermont.gov

*Counsel for the State of Vermont*

JAY JONES
*Attorney General of Virginia*
TILLMAN J. BRECKENRIDGE
*Solicitor General*
202 North Ninth Street
Richmond, VA 23219
(804) 786-7704
tbreckenridge@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

JOSHUA L. KAUL
*Attorney General of Wisconsin*
LYNN LODAHL
*Assistant Attorney General*
17 West Main Street
Madison, WI 53707
(608) 264-6219
Lynn.Lodahl@wisdoj.gov

*Counsel for the State of Wisconsin*

JOSH SHAPIRO
*Governor of the Commonwealth of Pennsylvania*
MICHAEL J. FISCHER
*Executive Deputy General Counsel*
JACOB B. BOYER
*Deputy General Counsel*
30 North Third Street, Suite 200
Harrisburg, PA 17101
(717) 831-2847
mjfischer@pa.gov

*Counsel for the Governor of the Commonwealth of Pennsylvania*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), I certify that:

1. Appellees have filed an unopposed motion for leave to file a 6500-word response to the pending stay motion. If the Court grants the request, this document complies with the limit of 6500 words and complies with the type-volume limitations of Fed. R. App. P. 27(d)(2) because, excluding parts of the document exempted by Fed. R. App. P. 32(f), it contains 6481 words and thus would not exceed the 6500-word limit. If the court denies the request, this brief exceeds the 5200-word limit otherwise set by Fed. R. App. P. 27(d)(2)(A).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(b) because the brief has been prepared in proportionally spaced typeface using Microsoft Word word-processing system in Times New Roman that is at least 14 points.

*/s/ Ian Fein*
Ian Fein
Deputy Solicitor General

## CERTIFICATE OF SERVICE

On September 7, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

*<u>/s/ Ian Fein</u>*
Ian Fein
Deputy Solicitor General